By the Review PaNel :
Upon the referral of the bill (H.R. 1761, 90th Cong.) “for the relief of Mr. and Mrs. Ralph J. Messina, Senior, and John H. FitzGerald” to the Chief Commissioner of the Court of Claims by the House of Representatives, and the subsequent filing of a petition by the claimants, the Chief Commissioner referred the case to Trial Commissioner Roald A. Hogenson for the conduct of further proceedings in accordance with the Rules of the Chief Commissioner. After conducting a trial, at which evidence was presented by the claimants and by the United States as respondent, and after the parties had been afforded an opportunity to submit requested findings of fact and briefs, Commissioner Hogenson filed on August 6, 1970, a report that included findings of fact and an opinion, in which he concluded that the claims asserted by the claimants were neither legally nor equitably justified, and that any payment thereon by the Congress would be a gratuity.
*996 Tbe claimants did not file any exceptions to Commissioner Hogenson’s report. Tbe United States filed exceptions to certain oí Commissioner Hogenson’s findings, and sucb exceptions bave been carefully considered by tbe review panel, although tbe review panel did not deem it necessary to hear oral argument on the exceptions since the claimants did not oppose them.
Subject to a few minor modifications, tbe review panel agrees with Commissioner Hogenson’s opinion and findings. Accordingly, such opinion and findings, as modified in certain minor respects, are subsequently set out as constituting part of the report to tbe House of Representatives.
Commissioner Hogenson’s opinion adequately explains why, in the opinion of tbe review panel, tbe claims asserted by the claimants do not constitute legal claims against tbe United States. Perhaps it would be advisable, however, for tbe review panel to supplement the portion of Commissioner Hogenson’s opinion in which he deals with the question of whether the claims involved in this case constitute equitable claims against the United States, i.e., claims which the Government, in good conscience, ought to pay.
As indicated in Commissioner Hogenson’s report, these claims grew out of actions by the military authorities in investigating the conduct of, and preferring court-martial charges against, Pfc. Ralph J. Messina, Jr. (the son of Mr. and Mrs. Ralph J. Messina, Sr.), who was on duty with the Army in South Korea at the time and assigned to the Korea Procurement Agency of the Army. Pfc. Messina was charged with having violated a lawful general regulation by accepting a gratuity from a person who was endeavoring to engage in procurement activities with the Army’s Korea Procurement Agency.
The investigation of Pfc. Messina was undertaken by an Army investigator after the investigator had been told by a Korean informant that a man named Messina in the Korea Procurement Agency had accepted bribes from Korean would-be contractors to favor them in the placement of their names on bidding lists. In the light of this information, it was quite appropriate for the Army investigator to investi *997 gate the matter. Indeed, a failure to do so would have amounted to a dereliction of duty.
Then, when the Army investigator talked to Pfc. Messina, the latter admitted that he had received 80,000 won ($296.30) from a prospective Korean contractor named Moon in return for a favor; and that he had turned approximately 10,000 won of this money over to a Miss Kang for safekeeping, Miss Kang being a Korean civilian who was employed in the Army’s Korea Procurement Agency.
The Army investigator next interviewed Miss Kang. She told the investigator that Pfc. Messina had turned over 11,000 won to her for safekeeping; that she had spent 3,000 won on her personal needs; and that she still had in her possession 8,000 won belonging to Pfc. Messina.
The Army investigator subsequently talked with Mr. Moon. The latter stated that he had asked for Pfc. Messina’s help in obtaining an opportunity to bid on contract proposals from the Korea Procurement Agency; that a few days later he received a proposal relating to the repair and maintenance of a drainage system; and that thereafter he met Pfc. Messina at a hotel and gave Messina 80,000 won.
On the basis of the material developed by the Army investigator, the commanding officer of the Korea Procurement Agency signed formal court-martial charges against Pfc. Messina, alleging that he had violated a lawful general regulation by accepting a gratuity of approximately 80,000 won from Mr. Moon, a person endeavoring to engage in procurement activities with the Korea Procurement Agency.
The charges against Pfc. Messina were subsequently withdrawn without Messina ever having been brought to trial. The principal reason for this action was that Mr. Moon informed Army authorities that if Pfc. Messina were brought to trial and he (Moon) appeared as a witness, he would testify that he did not pay any money to Pfc. Messina.
However, when the commanding officer of the Korea Procurement Agency was faced with the necessity of deciding whether or not to prefer court-martial charges against Pfc. Messina, he had to base his decision on the information which was available to him at that time. The available information *998 included an admission by Pfc. Messina that he had accepted money in return for doing a favor for Mr. Moon, a prospective contractor; a statement by Mr. Moon that he had paid money to Pfc. Messina; and a statement by Miss Kang that Pfc. Messina had turned money over to her for safekeeping.
It is the view of the review panel that it was not unreasonable for the commanding officer of the Korea Procurement Agency, on the basis of the information that was before him at the time when the charges against Pfc. Messina were preferred, to conclude that the available evidence was sufficient to justify the prosecution of Pfc. Messina for wrongdoing in the acceptance of a gratuity from a Korean desiring to do business with the agency to which Pfc. Messina was assigned. Hence, the review panel does not find in the actions of the Army authorities the sort of fundamental unfairness which would impose on the Government a moral obligation to pay claims for expenses, etc., arising out of the bringing of court-martial charges against Pfc. Messina.
The opinion and findings of Commissioner Hogenson, as modified by the review panel in a few minor respects, follow.
OpimtoN op the Trial Commissioner
Hogenson, Commissioner:
On June 18,1968, the House of Representatives by resolution (H. Res. 1111) referred to the Chief Commissioner of the Court of Claims, pursuant to 28 U.S.C. § 1492 (1964) and 28 U.S.C. § 2509 (1965-8 Supp. IV), for proceedings in accordance with applicable law, the bill (H.R. 1161) entitled “A bill for the relief of Mr. and Mrs. Ralph J. Messina, Senior, and John H. FitzGerald.”
The referred bill proposes enactment by the Senate and House of Representatives of legislation authorizing and directing the Secretary of the Treasury to pay $10,000 to Mr. and Mrs. Messina in full settlement of all their claims against the United States for legal expenses incurred in the defense of their son, Ralph J. Messina, Jr., a member of the United States Army stationed in Korea, in court-martial proceedings brought against him and dismissed before trial; and *999 $10,000 to John H. FitzGerald, attorney for Kalph. J. Mes-sina, Jr., in full settlement of all his claims against the United States for his loss of business and clientele by reason of the unnecessarily long period that he was required to remain in Seoul, Korea, in order to defend Messina in sucb proceedings.
In accordance with the authority and discretion vested in him by the above-cited statutory law, Chief Commissioner Marion T. Bennett referred this case to me to function as the trial commissioner for proceedings in accordance with the prescribed rules. Prior to such reference, plaintiffs had filed their petition herein, and thereafter defendant filed its answer thereto. After pretrial procedures had been completed, trial sessions were conducted before me at Boston, Massachusetts, on November 17, 1969, and at Washington, D.C., on November 20,1969. Thereafter the parties submitted their respective requested findings of fact, objections thereto, and opening and reply briefs.
My opinion, containing the requisite conclusions, and my findings of fact are submitted herewith, based upon a close observation of the demeanor and character of the witnesses in the trial proceedings, and upon a careful review and analysis of the trial record and the post-trial submissions of the parties.
For the reasons herein stated, it is my conclusion that plaintiffs’ demands are neither legal nor equitable claims against the United States, and that any payment thereon would be a gratuity.
Plaintiffs, Mr. and Mrs. Kalph J. Messina, Sr., are residents of Lunenburg, Massachusetts. Their son, Kalph J. Messina, Jr., was inducted into the United States Army on March 1,1965, after having attended State Teachers College for one year. After basic training at Fort Dix, New Jersey, he was processed in California for service in Korea. He became 22 years of age on July 27,1965. In August 1965, he was transferred to Seoul, Korea, where he was assigned to the Bidders Branch of the Army’s Korea Procurement Agency. He was a Private First Class assigned to the Bidders Branch during the time relevant in this case.
*1000 Plaintiff, John H. FitzGerald, was admitted to the practice of law in Massachusetts in May 1950, following his graduation from the School of Law, Boston College. He was thereafter admitted to practice in various federal courts and in the United States Supreme Court.
On February 18, 1966, Colonel Robert J. Keefer, Commanding Officer, Korea Procurement Agency, signed formal charges against Pfc. Messina, in which the specification was as follows:
Specification: In that Private First Class E-3 Ralph Joseph Messina Jr, US Army, United States Army Korea Procurement Agency, did, at Seoul, Korea, during the month of January 1966, violate a lawful general regulation, to wit: Paragraph 8a, Army Regulation 600-50, dated 3 April 1961, as changed by Change 1, dated 4 January 1965, by wrongfully accepting a gratuity of approximately 80?000 won from Moon, Kwang Chun, a person endeavoring to engage in procurement activities with the United States Army Korea Procurement Agency, an agency of the Department of Defense.
The 80,000 Korean won were worth $296.30. Colonel Keefer formally informed Pfc. Messina of the charges that same day.
Colonel Keefer preferred the charges on the basis of three documents: (1) A signed statement of Pfc. Messina given to Warrant Officer Robert W. Moody, (2) a typewritten summary by Moody of an oral statement of Moon Kwang Chun, a Korean hereinafter called Moon, and (3) a typewritten summary by Moody of an oral statement of Miss Kang, a Korean secretarial employee of the Korea Procurement Agency.
Pfc. Messina was one of two clerks in the Bidders Branch of the Korea Procurement Agency. Files of qualified Korean contractors were maintained in that office, other personnel of the Agency having approved such contractors. For each of the five categories of the Agency procurement, a separate card file was maintained for the eligible bidders within that category, with a separate card for each of the Korean contractors. Whenever a contracting officer of the Agency requested a list of bidders to be used in a particular procurement, such request was handed to one of the two clerks by *1001 the supervising sergeant in the Bidders Branch. Such clerk would then go to the appropriate card file, and pull the number of cards which corresponded with the number of bidders requested. The cards thus pulled would then be used to prepare a list of bidders on so-called Form 42. Such list was then approved by the civilian head of the Bidders Branch, and the original of the Form 42 forwarded to the particular contracting officer, with copies distributed to various offices of the Korea Procurement Agency, and one to the local office of the Army’s Criminal Investigation Division.
Each card file was to be maintained and used in alphabetical order and in rotation on successive procurements. Thus, cards used on a particular procurement were to be retired to the end of the card file, not to be used again until all other cards in the file had been used in alphabetical order. The purpose of the rotation was to insure that qualified bidders in alphabetical order within each category would have an equal number of opportunities to bid in the overall procurement program.
Before, after and during the months of January through March 1966, Warrant Officer Moody was assigned to the Criminal Investigation Division of the Eighth Army in Korea. His duties encompassed criminal investigations relating to the operations of the Korea Procurement Agency. He had an office in the building housing that Agency, available for his use.
Moody was then 26 years of age, and had served nine years in the Army, first on infantry assignment for two years, after which he functioned for some time as a general military policeman. In 1962, he completed a nine-week course conducted at a military police school, and the subjects presented concerned leadership, crime prevention, patrolling techniques, apprehension and search, search and seizure, and 40 hours of instruction in criminal law. In 1963, he was assigned to and took training in the Criminal Investigation Division. In time he was assigned to duties in Korea, and after the events involved in this case, in South Vietnam. At the time of his testimony in this case, he was a chief *1002 warrant officer assigned to Headquarters, United States Continental Command, Fort Monroe, Virginia.
About mid-January 1966, Moody routinely telephoned a Korean contractor who had previously informed Moody on several occasions that Korean contractors with knowledge of the Army’s bid estimates were engaging in collusive bidding on invitations issued by the Korea Procurement Agency. A meeting between them was prearranged. This informant had accurately predicted the low bid which would be submitted on Army procurements. Moody had been unable to obtain evidence that Army personnel were involved.
At the meeting, the Korean informant advised Moody that a man named Messina in the Korea Procurement Agency had accepted bribes from Korean contractors to favor them in the placement of their names on bidding lists.
Moody was instructed by his commanding officer, Colonel Alley, to investigate the matter further, and he made inquiries of four or five other Korean contractors to no avail. He then had his Korean interpreter-investigator, an Army civilian employee for several years, make an investigation among Korean contractors concerning Messina, but no additional information was obtained, although he confirmed the information Moody had previously received.
Moody then undertook to interview Pfc. Messina. Moody was acquainted with the duties of Messina in the Bidders Branch, and particularly with respect to the drawing of cards for preparation of lists of bidders.
Sergeant Martin A. Messina, not related to Pfc. Messina, had been chief clerk to 'Colonel Keefer until December 21, 1965, when he was retired from the service and departed from Korea. Sergeant Messina’s office was adjacent to that of Colonel Keefer in the building housing the Korea Procurement Agency, but on a different floor from that of the Bidders Branch. His duties did not involve the functions of the Bidders Branch, although he was occasionally seen to visit that office. No reasonable inference arises in this case that there was a mistake in identification of Pfc. Messina by confusion with Sergeant Messina.
*1003 At Moody’s request, at about 12:30 p.m. on February 2, 1966, Pfc. Messina went to Moody’s office, located near tbat of the Bidders Branch. During the nest 2% hours, the events occurred concerning the taking of the written statement of Pfc. Messina and making of the oral statement by Miss Kang.
At the outset of the meeting, Moody took possession of Messina’s Army identification card for the purpose of recording the data shown thereon. Moody then stated that Messina was suspected of violating an Army regulation which prohibited the accepting of bribes.
Before Messina made any response, Moody advised him that he did not have to answer any questions, or to do anything, but that anything he did say or do could be used against him in a trial or a court-martial.
This admonition complied with the requirements of Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831 (1964), providing in paragraph (b) as follows:
(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any. statement made by him may be used as evidence against him in a trial by court-martial.
Moody then stated in substance that he had information about Messina’s misconduct in accepting bribes, and that Messina might as well tell all about it. During the course of the exchange between them, Messina stated that he had accepted money from a contractor’s representative named Moon. Messina also stated that he had accepted a list of 13 contractors from Miss Kang, and that he had placed two of such names on a list of bidders ahead of their normal rotation. Moody had not been previously informed of these facts. Upon Moody’s inquiry, Messina advised that he had in his locker at his barracks the list supplied by Miss Kang and a copy of the Form 42 prepared in connection with the preference shown to the two bidders. Moody asked and Mes- *1004 sina agreed to provide Moody with, the form and the list at Messina’s barracks that evening.
During the course of the interview, Messina was cooperative and suggested to Moody that he would be willing to work for the Criminal Investigation Division as an undercover agent to ferret out wrongdoing within the Korea Procurement Agency. Moody declined the proposal, but stated that when Messina’s case had been disposed of, he would talk to him about the matter.
Moody then requested and Messina agreed to the preparation of a written statement of the matters revealed by Mes-sina during the course of the interview. This was accomplished by Moody’s use of a typewriter with Messina restating his admissions in response to questions propounded by Moody. The answers set forth in the statement were substantially in the words used by Messina, although not verbatim.
The statement was typewritten on Department of the Army Form 19-24, fully described in finding 14. The questions and answers are set forth in full in that finding. Upon the completion of the typing of the questions and answers, Moody requested Messina to read the statement and make and initial corrections and strikeovers (deletion of a word by x’s). Moody had deliberately made several strikeovers and also some errors in spelling, although some were inadvertently made.
Messina read the statement completely, and initialed most of the strikeovers and at least two of the corrections of misspelled words, some on each of the three pages of the statement. As requested by Moody, Messina also initialed the commencement and end of the statement on each page thereof.
It is concluded that Messina’s statement was voluntarily given to Moody, both orally and in writing, and that Mes-sina’s statement was not obtained through the use of coercion, unlawful influence, or unlawful inducement. See Article 31 (d), Uniform Code of Military Justice, 10 U.S.C. § 831(d) (1964).
Moody then called in another investigator who served as a subscribing witness. Moody administered orally to Mes- *1005 sina, and Messina orally acknowledged and signed the oath printed at the conclusion of the form.
Such oath stated that the subscriber had read and fully understood the contents of the statement, that the statement was true, that the subscriber had initialed all corrections and also the bottom of each page of the statement, and that the statement had been made freely without hope of benefit or reward, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement.
After the taking of the statement had been completed, Messina asked Moody what action would be taken against him, and Moody replied that he had no control over the disposition of the case. Messina expressed great concern as to whether or not his parents would be notified. Testimony to the contrary notwithstanding, it is concluded that the credible evidence is that Moody at no time threatened or attempted to contact Messina’s parents about the matter.
In summary, Messina’s written statement was that Mr. Moon, managing director of Sam Wha Engineering and Construction Company, came to him in the Bidders Branch and complained that his company had not received an invitation to bid, although registered as a qualified contractor; that Mes-sina explained to him how bidders were selected for issuance of invitations; that Moon said that if Messina would do him a favor, he in turn would do him a favor; that Moon asked Messina to meet with him downtown that evening; that they did meet at a restaurant; that Moon then asked Messina if there was any possible way Messina could put his company’s name ahead of other contractors; that Messina told Moon that he could pull his card and place him on a contract; that Messina later pulled Moon’s card and five other cards at random, and placed them on a list of bidders, and that invitations to bid were mailed to them that day; that Moon called him a couple of days after their first meeting; that as agreed they met downtown that evening; that Moon asked Messina if Messina had sent him a proposal; that Messina replied that there was one in the mail, and that it should be received in a few days; that thereafter Messina met with Moon and his company’s vice president in a hotel room; *1006 that Moon asked Messina if he could help him in the future; that Messina replied that any other proposal received by Moon would be issued strictly by the rotation system used for bidders’ lists; that Moon then handed him 80,000 won for the services Messina had done; that the vice president of the company stated that if Messina continued to help him, he would be willing to pay Messina more money; that Mes-sina replied that he would have no further dealings with them.
Messina also stated in his written statement that Miss Kang had asked him to put her brother or cousin on a contract; that one day last week Miss Kang gave him a list of 13 contractors; that she requested him to use the contractors on the erosion control proposal; that he thought it over, and told Miss Kang that he was not going to put the 13 names on the list; that he now understood that two of the names had been included on the list of bidders; that he didn’t select any of the names on the proposal.
In his written statement, Messina also stated that he had 10,000 of the 80,000 won left, and that he had given the 10,000 to Miss Kang to hold for him; that he knew he had done something wrong and was willing to take the punishment for it; that he felt that he was old enough to know when he had done something wrong, and that he was sorry for what he had done.
During the 2^2 hours in the afternoon of February 2,1966, Moody , advised Messina that he was going to interview Miss Kang about her part in the matter, and Moody asked and Messina agreed that he would come into the room in her presence and tell her what he had advised Moody with respect to her conduct, in the event she denied the acts.
Moody then sent Messina back to his duty post, and called in and proceeded to interview Miss Kang. Her office was immediately adjacent to the Bidders Branch, separated by a partition. She spoke English, but obviously with some difficulty, because Moody had his Korean interpreter-investigator verify her statements by conversation in the Korean language. She denied giving Messina the list of names.
*1007 Moody tlien called Messina back into the office, and Messina related to Miss Kang what he had told to Moody. She then admitted giving the list of names to Messina.
Miss Kang declined to give Moody a signed written statement, but her oral statement was thereafter recorded by Moody as an investigator’s statement, set forth fully in finding 15. In summary, this statement was that Miss Kang verbally admitted that she had approached Messina and his fellow clerk in the Bidders Branch and requested them • to assist her cousin in receiving invitations to bid; that during the week of January 23-29,1966, she received a list of 13 construction contractors from her cousin; that she presented the list to Messina and requested him to use the names on a list of bidders for an erosion control contract; that two of the 13 names appeared on a list of bidders prepared by Messina and his fellow clerk; that she was in possession of 8,000 won belonging to Messina; that she had received 11,000 won from Messina of tire 80,000 won paid by Moon to Messina; and that she had spent 3,000 won on her personal needs.
During the evening of February 2, 1966, Moody went by automobile to Messina’s barracks. Outside of the barracks, Messina handed to Moody the copy of a Form 42 and an attached list of 13 Korean contractors. Some of the names listed in each document were common to both.
Messina was at his duty post in the Bidders Branch for about three days after February 2,1966, but thereafter was confined to his barracks, except when escorted by someone of superior grade, until the charges against him were withdrawn on March 29,1966.
Moody returned to Messina his Army identification card in the afternoon of February 2, 1966, but Messina was required to surrender the same at the time of restriction to quarters, and such card was not returned to him until the charges were withdrawn.
It reasonably appears that the interrogation of Pfc. Mes-sina by Warrant Officer Moody was custodial in nature, i.e., that Messina was deprived of his freedom in a significant way. In Miranda v. Arizona, 384 U.S. 436, 479, decided *1008 June 13,1986, the Supreme Court held that in such an interrogation, the individual subjected to questioning by police officers not only “must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law,” but also must be advised “that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.” Otherwise, no evidence obtained as a result of such interrogation can be used against that individual in a trial of criminal charges against him.
Moody adequately warned Messina of his rights, as required by the Miranda rule in implementation of the Fifth Amendment, except that he made no mention of Messina’s entitlement to an attorney. As it existed in 1966, Article 31, Uniform Code of' Military Justice, made no mention of entitlement to an attorney as part of the prescribed admonition to be given to an individual about to be subjected to questioning by military authority. Retroactivity of the Miranda rule was considered by the Supreme Court in Johnson v. New Jersey, 384 U.S. 719, 732, decided June 20,1966, and it was held that such rule was not to be applied retroactively, but only to trials begun after the Miranda decision was announced on June 13, 1966. In United States v. Decker, 16 USCMA 397, decided November 18, 1966, the United States Court of Military Appeals held that it was not reversible error when a court-martial received in evidence a defendant’s confession, when there was a failure to advise the defendant of his right to the presence of an attorney during custodial interrogation, and when the trial by court-martial occurred prior to the announcement by the Supreme Court of its decision in the Miranda case. However, in United States v. Tempia, 16 USCMA 629, 635, decided April 25, 1967, the Court of Military Appeals construed the Miranda rule as governing all criminal interrogations by federal and state authorities, military or civilian, if resulting statements are to be used in trials commencing on and after June 13,1966.
Since even a defendant convicted in a trial by court-martial is not entitled to retroactive application of the rule requiring *1009 an admonition of entitlement to an attorney in custodial interrogation leading to a confession, it cannot reasonably be beld that Messina was entitled to such an admonition when both his interrogation and the withdrawal of charges against him occurred prior to June 13,1966.
On February 3,1966, Warrant Officer Moody was instructed by his commanding officer, Colonel Alley, to investigate further and attempt to corroborate Messina’s admissions.
On February 8, 1966, Moody interviewed Moon Kwang Chun relative to the statement given by Messina to Moody on February 2, 1966. Since Moon did not speak English well, Moody’s assigned Korean interpreter-investigator served as interpreter of the statements made by Moon in the Korean language. Moody requested but Moon declined to make a written statement. Moody then prepared his investigator’s statement of the interview, set forth in full in finding 17.
In summary, this statement reports that Moon stated that he met Messina at the Korea Procurement Agency; that they met by agreement at a downtown restaurant; that Moon advised Messina that his company had been in business for about a year and had not received any proposals from the Agency; that Moon asked for Messina’s help in getting a proposal; that Messina made no definite commitment to give any assistance; that a few days later Moon did receive a proposal on a drainage system job; that Moon then contacted Messina by telephone and suggested a meeting; that Moon and Messina met in a hotel room; that Moon offered to buy some drinks for Messina, but Messina refused; that Moon gave Messina the 80,000 won he intended to use to buy the drinks; that Messina accepted the money and departed the hotel; that the 80,000 won were personal funds of Moon, not money of his company; that Moon’s payment of the money to Messina was without the knowledge or sanction of the company; and that Moon alone was to be held responsible.
After preferring the charges against Messina on February 18,1966, Colonel Keefer forwarded the formal charges to Colonel Ralph J. Whitt, Commanding Officer, Special Troops, Eighth Army, whose command covered the Korea Procurement Agency. Attached to the transmittal form were *1010 the written statement of Messina and Moody’s summaries of the oral statements of Moon and Miss Kang. The documents were received by Colonel Whitt on February 21, 1966.
On that same day, a Lt. Haeder and Pfc. Messina went to the telegraph office in Seoul, Korea, and Lt. Haeder prepared and caused to be transmitted to plaintiff Ralph J. Messina, Sr., a telegram, quoted in full in finding 20, which advised that young Messina (Ralph) had been accused of accepting a bribe from a contractor, that the contractor had physically threatened Ralph, that Ralph suspected a frame by the local CID which grilled him on four occasions until he signed a statement admitting the accusation, that Ralph was very agitated and frightened, and requested that John FitzGerald be sent.
Lt. Haeder was a young lawyer, admitted to the practice of law in Oregon, just prior to the start of Ms military service. Pie was assigned as counsel to contracting officers in the Korea Procurement Agency. He was a close friend of Pfc. Messina.
On March 7, 1966, by order of Colonel WMtt, the charges against Messina were referred to a special court-martial which had previously been appointed by Colonel WMtt, who had special court-martial jurisdiction only, and could not convene a general court-martial. As provided by Article 19, UMtform Code of Military Justice, 10 U.S.C. § 819 (1964), special courts-martial have jurisdiction to try persons for noncapital offenses, but cannot impose punishment by way of dishonorable discharge, dismissal, confinement for more than six months, hard labor without confinement for more than three months, forfeiture of pay exceeding two-thirds pay per month, or forfeiture of pay for more than six months.
Lt. Thomas McElwain was appointed trial counsel, or prosecutor of the charges against Messina, and Lt. Robert K. Frazier was appointed defense counsel for Messina. Neither of them was a lawyer, but both had had considerable experience as counsel in a special court-martial.
Lt. Frazier did not confer with Pfc. Messina at any time. However, he and Lt. Haeder did call on Warrant Officer *1011 Moody and engage in a discussion concerning the taking of Messina’s statement by Moody. They asked whether Moody had instructed Messina as to his rights under Article 31 of the Uniform Code of Military Justice. Moody repeated for them the admonition he had given to Messina, as related above.
Lt. Haeder was never assigned to defend Messina, but did voluntarily confer with and advise Messina. On one occasion at his office, he declined to talk with Messina, asserting that he had been instructed not to participate in the matter.
Colonel Keefer, head of the Korea Procurement Agency, learned that Lt. Haeder was devoting a considerable portion df his duty time acting as a legal advisor to Messina, and told Haeder that unless he was assigned as defense counsel, he was to perform his duties at the Procurement Agency, and that he had no proper business in the Messina case solely on the happenstance that he was a lawyer. No request was ever made that Lt. Haeder be assigned as defense counsel for Messina. Despite Colonel Keefer’s instructions, Lt. Haeder continued to participate in the Messina case.
Upon receipt of the telegram concerning his son’s plight, plaintiff Ralph J. Messina, Sr., undertook to retain plaintiff John H. FitzGerald to go to Seoul, Korea, to defend young Messina. FitzGerald was reluctant to take the case, advising that an adequate fee would be $20,000.
However, FitzGerald undertook to secure information concerning the nature and status of the charges against Pfc. Messina, and obtained the assistance of Congressman Philip J. Philbin of Massachusetts. By telephone calls on March 9 and 10, 1906, the Legislative Liaison Branch, Department of the Army, obtained from Headquarters, Special Forces, Eighth Army, Seoul, Korea, the information that the expected trial date of the charges against Messina was March 21,1966, that Messina was charged with violation of an Army regulation by accepting a gratuity of 80,000 won from a Korean who was engaged in procurement activity with the Department of Defense, and that the type of court-martial was special. This information was provided to Congressman Philbin and in turn by him to FitzGerald.
*1012 The maximum, amount of money which plaintiff Ralph J. Messina, Sr., was able to raise to pay fees and expenses of Mr. FitzGerald to undertake the case was the sum of $6,000. His home was then mortgaged, with the unpaid balance being $2,000. To obtain the $6,000, the mortgage indebtedness was refinanced in the sum of $8,000, and the expenses incident to the refinancing were from $100 to $125. After considerable importuning by the elder Messina, FitzGerald agreed to take the case, and on March 15, 1966, the sum of $6,000 was deposited by the elder Messina in FitzGerald’s bank account.
In the meantime, FitzGerald obtained a passport, and made a trip to New York City for the purpose of obtaining, and where he did obtain, a visa from the South Korean Embassy, expedited by the intervention of agents whom he found and retained.
After making arrangements through a travel agency, Fitz-Gerald departed by airplane from Boston to Seoul, Korea, on March 16, 1966. After stops at San Francisco, Honolulu, and Tokyo, he arrived at Seoul Airport on March 19, 1966, and then obtained a room at the Chosun Hotel. He then contacted Pfc. Messina. About an hour later, Messina arrived at the hotel, escorted by a Sergeant Davis, who advised Fitz-Gerald that orders existed that Messina was confined to the base unless accompanied by a superior, after first securing permission. As requested by FitzGerald, Sergeant Davis waited in the hotel lobby, while FitzGerald conferred with Messina in the hotel room. The conference lasted for several hours. When FitzGerald concluded his interrogation of Mes-sina, it was evening, and Messina departed with Sergeant Davis to return to the base.
The next day, Sunday, March 20,1966, FitzGerald went to the barracks to which Messina was assigned, and there met and conferred with Messina, Lt. Haeder, Pfc. Gary W. True, who was the other clei'k in the Bidders Branch, and several other colleagues of Messina.
On March 21, 1966, the date set for the trial of charges against Messina before the special court-martial, FitzGerald was ready to commence the trial with preliminary motions to *1013 quash and to suppress evidence, obviously planning to attack the validity and admissibility in evidence of the statement made by Messina to Moody. In the meantime, Major Leonard L. Preston, Adjutant to Colonel Whitt, had postponed the trial until March 23, 1966, with the approval of Colonel Whitt. The appointed trial counsel, Lt. McElwain, had advised Major Preston that Moon, the alleged briber of Messina, and Miss Kang had both stated that they would not appear as witnesses, and that since there was no way to compel them to testify, there would be no proof of the corpus delicti, or proof of the commission of a crime, essential to the admission in evidence of the confession of Messina.
On March 21, 1966, FitzGerald met with Lt. McElwain, and his assistant trial counsel, Lt. Griffin, who advised Fitz-Gerald that they had previously recommended to Major Preston that the charges against Messina be dropped because of inability to prove the corpus delicti.
FitzGerald then requested Lt. McElwain and Lt. Griffin to accompany him for a meeting with Major Preston. At the latter’s office, FitzGerald in his own words “blew his top” concerning Major Preston’s refusal to dismiss the charges against Messina.
Prior to March 21,1966, Colonel Whitt had been advised by Major Preston that there was some doubt that Moon and Miss Kang would appear as witnesses at the trial, but that the refusal was not conclusive. He approved the postponement of the trial to March 23,1966, with the understanding that a final effort would be made to have those witnesses appear and testify.
On March 21, 1966, Colonel Whitt received FitzGerald at his office, and FitzGerald asserted that Moody had used unlawful tactics in obtaining the statement from Messina, and that Major Preston was an incompetent. FitzGerald asserted that if Colonel Whitt insisted on bringing the case to trial, he would use certain legal precedents and tactics to confuse the court, would make the court look silly, and if necessary, would take the case all the way to the Supreme Court.
*1014 Colonel Whitt then took the matter up with the Office of the Staff Judge Advocate of the Eighth Army, explaining the nature of his interview with FitzGerald, and suggesting that a qualified Army lawyer should 'be assigned as trial counsel to engage in the trial to meet the tactics and experience of FitzGerald. The JAG office agreed with Whitt, and undertook to find an Army lawyer available for assignment to the case.
On March 22, 1966, FitzGerald, in the company of Lt. Haeder, interviewed separately Miss Kang and Moon.
In his affidavit in evidence in this case, being the same one submitted to the Committee of the Judiciary of the House of Representatives, FitzGerald asserted that by using the methods which he ascribed to Warrant Officer Moody, he was able to get the desired affirmative or negative answer to any question asked of Miss Kang. In the affidavit, FitzGerald asserted that Miss Kang denied that she had any knowledge of Messina’s involvement with any Korean contractor or any knowledge of 80,000 won, and that she responded that Moody had threatened to prevent her plans to enter the United States to work in the United Nations. In the affidavit, Fitz-Gerald asserted that Moon denied emphatically that he had ever given a 'bribe to Messina, and ascribed to Moon statements to the effect that Moody promised Moon assistance in acquiring contracts if he would help Moody “get” Messina.
On March 23, 1966, in accordance with advice received from the Eighth Army JAG office, Colonel Whitt by order appointed Captain Harvey L. Anderson, a qualified Army lawyer, as trial counsel in Messina’s case, Captain Anthony P. Cillufo, as defense counsel for Messina, Lt. McElwain (previously trial counsel) as assistant trial counsel, and Lt. Frazier (previously defense counsel) as assistant defense counsel. Captain Cillufo was appointed to assist FitzGerald because FitzGerald had previously requested assignment of a qualified Army lawyer to assist him on technical matters relating to a trial by court-martial. Captain Cillufo thereafter diligently cooperated with FitzGerald.
At the time of his appointment, Captain Anderson was assigned to the 7th Administrative Company, 7th Infantry *1015 Division, at Camp Casey, Korea, located about 25 miles north of Seoul. To allow Captain Anderson time to accomplish travel from Camp Casey, and thereafter prepare for the trial, the trial of the charges against Messina was by order of Colonel Whitt postponed first to March 26, 1966, and then to March 29,1966.
On March 23, 1966, FitzGerald “summoned” (to use his own word) the two original prosecutors, Lt. McElwain and Lt. Griffin, Lt. Haeder, and Major Preston into the office of Colonel Whitt, where (again using his own words) FitzGerald
* * * stood up and reviewed every detail of this matter, hurling barbed accusations at army officers (some being present) who were distorting the truth, manufacturing evidence, coercing Korean nationals under penalty of forfeiture, and brainwashing enlisted personnel in order to convict Pvt. Messina on an obviously trumped-up charge. * * *
FitzGerald stated that this speech was an “hour and one half indictment of the military,” and that not one small voice was raised in opposition to any accusatory statement made by him. His conclusion was that such silence was a classic consent to the truth of the matters asserted by him. Such an inference cannot reasonably be drawn from the circumstances attendant to this meeting.
By letter to Colonel Whitt, dated March 23, 1966, Fitz-Gerald expressed violent opposition to delays in the trial, demanded dismissal of the case, asserted that Moody had illegally interrogated Messina, stated that the actions of Moody were like a Russian-spawned novel, accused Major Preston of seeking assignment of an Army lawyer to insure conviction of Messina, claimed that Major Preston was delaying the trial for greed and his own self aggrandizement, extolled his own patience as endowed by birth and derived from the nature of his profession, and advised that he would submit a bill to the Army to reimburse all of his expenses in addition to bis loss of business in Boston.
Thereafter Captain Anderson appeared at the base and undertook his investigation of the charges against Messina. *1016 On two or three occasions, he met with FitzGerald, with the last of such meetings on Sunday, March 28,1966.
In the meantime, Captain Anderson held a series of interviews, first with Lt. McElwain and Warrant Officer Moody, then with Major Preston, then with Colonel Whitt, and after time spent in studying the case file and planning his investigation, meetings in succession with Miss Kang and Moon. Moon stated to Captain Anderson that he would not testify.
On March 28, 1966, Captain Anderson addressed his written recommendations through the Staff Judge Advocate, Eighth Army, to Colonel Whitt, and stated that the statement or confession of Messina would be admissible in a trial; that Moon denied that he paid any money to Messina, and would so testify if he appeared as a witness; that Moon was not amenable to process; that Miss Kang was not a party to the original transaction; that she received money from the accused to hold for him; that she indicated that she may not have known where Messina obtained the money; that in order to convict an accused of a crime, it must be proved independently of a confession that a crime was probably committed; that Moon was an essential witness and without him no proof of the crime could be established; and that any testimony of Miss Kang would not establish the commission of an offense. Captain Anderson’s recommendation was that the charge and specification against Messina be dismissed, and that consideration be given to withholding an amount equal to the 80,000 won from Messina’s pay on the ground that he received the money for discharging his duty to the United States.
By a written statement issued March 29, 1966, Colonel Whitt announced that the charges against Messina were withdrawn. FitzGerald was advised of such action in turn by Captain Cillufo and Captain Anderson in the early evening of March 29, 1966.
FitzGerald departed from Seoul, Korea, on March 30,1966, and reached Boston some five days later, including a stopover at Honolulu for three days. Prior to his departure from *1017 Seoul, FitzGerald advised plaintiffs, Mr. and Mrs. Ralph J. Messina, Sr., by telephone that the charges had been withdrawn against their son.
In accordance with instructions requested and received from the Commanding General, Eighth Army, Colonel Whitt thereafter caused the 8,000 won, which had been confiscated from the possession of Miss Kang, to be turned over to the servicing finance officer for deposit in a prescribed Army account, and thereafter caused a sum equal to 72,000 won ($266.67) to be deducted from the pay of Pfc. Messina.
There can be no doubt that the preferment of charges against their son caused severe emotional distress to plaintiffs, Mr. and Mrs. Ralph J. Messina, Sr., who both were in ill health at the time they learned of their son’s plight. Mrs. Messina’s condition of emotional difficulty was worsened by knowledge of the charges against her son, causing an acute anxiety state which lasted for a substantial period of time. She remained under the care of a doctor. However, there is no evidence as to the extent, if any, to which costs of medical care for Mrs. Messina were increased as a result of her knowledge of her son’s difficulties in the service. When informed of his son’s case, Mr. Messina was 64 years of age, and had only recently recovered from a major operation for removal of eight or nine inches of arteriosclerotic arteries from each of his legs, with replacement by artificial arteries. His planned retirement at age 65 from employment in a plastic mill has been prevented by the financial obligations undertaken by him to pay the $6,000 to FitzGerald.
Prior to 1960, FitzGerald had had an extensive practice in the law, engaging in many trials, civil and criminal, both jury and non-jury. Commencing in 1960, his practice of law tapered off, as he began to engage in business activities. In 1966, and for a year or two prior thereto, he was spending 80 percent of his time in the operation of a restaurant, of which he was part owner, located in Chelsea, Massachusetts. There is no substantial evidence that FitzGerald sustained any loss of business or clientele as a result of his trip to Seoul, Korea, to defend Pfc. Messina.
*1018 It is also clear that FitzGerald was not required to remain in Seoul an “unnecessarily long period.” The record shows that FitzGerald was in Seoul 11 days, i.e., from March 19, 1966, to March 30,1966. Messina’s trial was originally set to commence on March 21, 1966, but it was successively postponed to March 23, 1966, March 26, 1966, and March 29, 1966. The first postponement was made because of advice that it was doubtful that Moon and Miss Kang would appear as witnesses, the case for the prosecution depending on their testimony. The second and third postponements were due to the commanding officer’s decision to obtain a new Army lawyer to prosecute the case, as well as to obtain the services, at FitzGerald’s request, of a qualified Army lawyer to assist him on technical matters relating to a trial by court-martial. Such request was accommodated by furnishing FitzGerald with two Army defense counsel (Captain Cillufo and Lt. Frazier). Under the circumstances, there is no showing that FitzGerald’s being required to remain in Seoul for 11 days was an unnecessarily long period.
As detailed in finding 3'3, FitzGerald incurred and paid expenses in connection with his services in Messina’s case in the total sum of $1,585, and the net fee received by him thus amounted to $4,415.
The time spent by FitzGerald on the Messina case, allowing 1 full day for his trip to New York City and 18 days for the trip to Korea (the total elapsed time between his departure from and return to Boston included 20 days, but at least 2 days of the 3-day stopover in Honolulu on the return trip are regarded as serving FitzGerald’s personal convenience) amounted to 19 calendar days. His net fee of $4,415 thus amounted to a daily rate of $232 per calendar day. There is nothing in the record to indicate that this rate was inadequate, in view of the limited capacity of his clients to pay attorney’s fees, and especially because of the failure of proof that FitzGerald sustained any loss of business or clientele on account of his services in the Messina case.
Plaintiffs contend that there was a gross and compounded maladministration of justice by various Army personnel in *1019 volved in the investigation, preferment and handling of charges against Pfc. Messina. The alleged misconduct on the part of Army personnel would be tortious, and any legal cause of action against the United States for their alleged acts or omissions is proscribed by provisions of .the Federal Tort Claims Act. The Government is exempt from liability on “Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.” 28 U.S.C. § 2680(a) (1964). Also, the Government is exempt from liability on the following types of tort claims, set forth in 28 U.S.C., § 2680 (h), as follows:
(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.
As to plaintiffs’ contentions that they have equitable claims against the United States, the law is well established that the word “equity” in Congressional reference cases comprehends broad moral responsibility, i.e., what the Government ought to do as a matter of good conscience, reasonably measured by equitable claims recoverable against a private party. Webb v. United States, 192 Ct. Cl. 925 (1970).
Plaintiffs have presented no substantial basis upon which it can be reasonably concluded that an equitable cause of action exists in this case, nor do the facts and circumstances of this case establish a premise for such a holding. The claims in this case are neither legally nor equitably justified, and any payment thereon would be a gratuity.
FINDINGS of Fact
1. Plaintiffs, Mr. and Mrs. Ealph J. Messina, Sr., are residents of Lunenburg, Massachusetts, and are the parents of Ealph J. Messina, Jr.
2. Ealph J. MesSina, Jr., was inducted into the Army of the United States on March 1, 1965. He had previously attended State Teachers College for one year. After basic *1020 training at Fort Dix, New Jersey, be was transferred as a Private E-2 to California, where he was processed for service in Korea. He became 22 years of age on July 27, 1965. In August 1965, he was sent to Seoul, Korea, where he was attached to the Army’s Korea Procurement Agency. His assignment was to the Bidders Branch of that Agency. In the months of January, February and March 1966, during which time an investigation of misconduct on his part was conducted, and charges preferred against him and dropped, he was a Private First Class. In August 1966, he was promoted to the nest higher enlisted grade, and served several months thereafter until honorably discharged from the service at the end of his induction period.
3. Plaintiff, John H. FitzGerald, was admitted to the practice of law in Massachusetts in May 1950 after receiving his Bachelor of Laws degree from Boston College, School of Law, in January 1950. He has been admitted to the practice of law in various federal courts and in the United States Supreme Court.
4. The petition was filed in this case on October 30, 1968, pursuant to H. Res. 1111, June 18,1968,90th Cong., 2d Sess., which referred to the Chief Commissioner of the Court of Claims, pursuant to sections 1492 and 2509 of title 28, United States Code, for proceedings in accordance with applicable law, the bill (H.R. 1761) entitled “A bill for the relief of Mr. and Mrs. Ralph J. Messina, Senior, and John PI. FitzGerald.”
The referred bill (H.R. 1761) proposes enactment by the Senate and House of Representatives:
* * * That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated—
(1) to Mr. and Mrs. Ralph J. Messina, Senior, of Lunenburg, Massachusetts, the sum of $10,000 in full settlement of all their claims against the United States for legal expenses incurred in the defense of their son, Ralph J. Messina, Junior, a member of the United States Army stationed in Korea, in court-martial proceedings brought against him and dismissed before trial; and
*1021 (2) to John H. FitzGerald,_ Esquire, of Chelsea, Massachusetts, attorney for said Balph J. Messina, Junior, the sum of $10,000 in full settlement of all his claims against the United States for his loss of business and clientele by reason of the unnecessarily long period that he was required to remain in Seoul, Korea, in order to defend Messina in such proceedings. * * *
5. During the part of the period of assignment of Balph J. Messina, Jr., to the Bidders Branch of the Korea Procurement Agency, up to December 21, 1965, Sergeant Martin A. Messina, not related to Pfc. Messina, was chief clerk to Colonel Bobert J. Keefer, Commanding Officer of the Korea Procurement Agency. His office was adjacent to that of Colonel Keefer, located in the building housing the Agency, but on a different floor from that of the Bidders Branch. His duties are not shown to have involved the functions of the Bidders Branch, although he was occasionally seen to visit that office. He was retired from the Army and returned to the United States on December 21,1965.
The evidence in this case does not reasonably justify the drawing of an inference that there was a mistake in identification of Pfc. Messina as an accused person because of confusion with Sergeant Messina.
6. Pfc. Messina was one of two clerks in the Bidders Branch, the other being another private first class, Gary W. True. The two clerks were supervised by a sergeant, and there was a Civil Service employee as head of the office.
The Bidders Branch maintained files of Korean contractors who had been approved by other personnel of the Korea Procurement Agency as qualified to do business with the Army.
A card file system was maintained in the Bidders Branch of the qualified contractors, and the name of each was set forth on a separate card, together with other pertinent information relating to that contractor. There were about 300 of such cards.
The various cards were segregated into different categories in accordance with the subject matter of procurement, such *1022 as food supplies, construction, etc., and a separate file of such cards was maintained for each category of procurement.
Within each category, the cards were to be maintained in the alphabetical order of the names of the qualified contractors. In order to provide for equal opportunity for bidding on the successive procurements, the lists of bidders were to be prepared by use of the cards in alphabetical succession, with each card to be used again only after all other cards had been used in rotation. When the first card in the file was pulled for use in a current procurement, it was then to be placed at the end of the file to be used again only after all other cards had been used in turn in preparing lists of bidders. Thus, there was to be a continuous rotation of the cards in alphabetical order.
There were five categories of such cards, which corresponded with the division of procurement by subject matter into five sections within the Korea Procurement Agency.
7. When a contracting officer assigned to one of the procurement sections desired a list of prospective bidders for use in a particular procurement, he forwarded a suitable request to the Bidders Branch, designating the number of bidders desired, usually six, but not to exceed 12 under existing instructions.
In the office routine, the sergeant in the Bidders Branch handed such a request to either Pfc. Messina or to his fellow clerk. When assigned the task, the clerk would go to the appropriate card file, and pull the number of cards indicated by the number of bidders requested. If six bidders were requested, he was to pull the first six cards in the file, as the file then existed in its state of rotation. The cards pulled by the clerk on a particular request were then used to prepare a list of bidders on so-called Form 42. Several copies were prepared. After approval of the list by the head of the Bidders Branch, the original of the Form 42 was supplied to the pertinent contracting officer, and the copies were distributed to various branches of the Korea Procurement Agency, with a copy supplied to the Army’s local office of its Criminal Investigation Division.
*1023 8. In the period of time relevant in this case, 'and particularly in the months of January, February and March 1966, Robert W. Moody was a warrant officer in the Criminal Investigation Division of the Eighth Army in Korea. His duties encompassed criminal investigations relating to the operations of the Korea Procurement Agency. In that connection, he had an office in the building housing that Agency, available for his use, although his main office was elsewhere.
Warrant Officer Moody was then 26 years of age, having served continuously in the Army since his first enlistment at 17 years of age. He served two years on infantry assignment, after which he functioned as a general military policeman. In 1962, he completed a nine-week course conducted at a military police school. The subjects presented concerned leadership, crime prevention, patrolling techniques, apprehension and search, and search and seizure, and 40 hours of instruction in criminal law. In 1963, he was assigned to and took training in the Criminal Investigation Division. In time he was assigned to duties in Korea, and after the events involved in this case, in South Vietnam. At the time of the taking of his testimony in this case on November 20, 1969, he was a chief warrant officer assigned to Headquarters, United States Continental Command, Fort Monroe, Virginia.
9. Warrant Officer Moody had become generally acquainted with the operations of the Korea Procurement Agency, commencing in July 1965. He knew who Sergeant Messina and Pfc. Messina were, although he had had no direct dealings or associations with either of them. He was aware that Sergeant Messina had departed from Korea prior to Christmas of 1965.
10. About mid-January 1966, a Korean contractor who had served as an informant to Moody in investigations concerning alleged conspiracies between Korean contractors for collusive bidding on the basis of the Army’s hid estimates on proposed procurements, was contacted by telephone by Moody, as had been done by Moody on several prior occasions, and a meeting was prearranged between them. This Korean informant spoke passable English. Moody could not recall his name in his testimony in this court, nor is such informant *1024 otherwise named in the record in this case. This informant, in connection with Ms advice concerning collusive bidding, had accurately predicted the low bid which would be submitted on Army procurements by the Korea Procurement Agency. Moody had not been able to obtain any evidence that Army personnel were involved in the alleged collusive bidding.
11. At the meeting, with no other person in attendance, the Korean informant advised Moody that a man named Messina who worked at the Procurement Agency had accepted bribes from. Korean contractors to favor them in the placement of their names on bidding lists, so that they would receive more invitations to bid than they otherwise would.
12. Warrant Officer Moody then conferred with his commanding officer, Colonel Alley, who instructed him to investigate the information concermng Messina further, and Moody then made inquiries of four or five other Korean contractors to no avail. Moody had regularly assigned to Mm a Korean interpreter-investigator, an Army civilian employee for several years, who had not previously accompanied Mm on the pertinent investigation, and Moody requested him to investigate the matter. The interpreter-investigator thereafter advised Moody that he had only been able to secure the same information previously obtained by Moody, apparently from the same source.
Moody then undertook to interview Pic. Messina. Moody was acquainted with the duties of Messina in the Bidders Branch, and particularly with respect to the drawing of cards for preparation of lists of bidders.
13. At Moody’s request, Pf c. Messin'a went to Moody’s office, located near that of the Bidders Branch on the same floor of the building, on February 2, 1966, at about 12:30 p.m. During the following 2y2 hours, the events concerning Messina occurred, as described in this finding and findings 14 and 15.
At the outset Of their meeting, Moody took possession of Messina’s Army identification card for the purpose of recording the data shown thereon, and then stated that Messina was suspected of violating an Army regulation wMch prohibited *1025 tlie accepting of bribes. During the interview with Messina, Moody had a tape recorder in operation, but there is no evidence as to whether effective tape recordings were accomplished or as to what may have happened to any such recordings.
Before Messina made any response, Moody advised Messina that he did not have to answer any questions, or to do anything, but that anything he did say or do could be used against him in a trial or a court-martial. Because of trouble encountered with his tape recorder, Moody repeated this admonition.
Moody then stated in substance that he had information about Messina’s misconduct in accepting bribes, and that Messina might as well tell all about it. During the course of the exchange between them, Messina stated that he had accepted money from a contractor’s representative named Moon. Messina also stated that he had accepted a list of 13 contractors from Miss Kang, a Korean secretarial employee of the Korea Procurement Agency, and that he had placed two o'f such names on a list of bidders ahead of their normal rotation. Moody had not been previously informed of these facts. Upon Moody’s inquiry, Messina advised that he had in his locker at his barracks the list supplied by Miss Kang and a copy of the Form 42 prepared in connection with the preference shown to the two bidders. Moody asked and Messina agreed to provide Moody with the Form 42 and Miss Kang’s list at Messina’s barracks that evening.
During the course of the interview, Messina was cooperative and suggested to Moody that he would be willing to work for the Criminal Investigation Division as an undercover agent to ferret out wrongdoing within the Korea Procurement Agency. Moody declined the proposal, but stated that when Messina’s case had been disposed of, he would talk to him, about the matter.
14. Moody then requested and Messina agreed to the preparation of a written statement of the matters revealed by Messina during the course of the interview. This was accomplished by Moody’s use of a typewriter with Messina restating his admissions in response to questions propounded by *1026 Moody. The answers set forth in the statement were substantially in the words used by Messina, although not a verbatim recording.
The statement was set forth on Department of the Army Form 19-24, and in appropriate spaces provided thereon, were recorded Messina’s name, service assignment, service number and grade, and the date (February 2, 1966) of the taking of the statement.
The statement form contained a preamble, printed except for filling of appropriate 'blanks for a particular case, that the maker of the statement had been informed by the investigator that an investigation was being conducted of suspected misconduct on the part of the maker, that Article 31 of the Uniform Code of Military Justice had been explained by the investigator to the maker, and that the maker understood that he did not have to make any statement whatsoever and that any statement made could be used as evidence against the maker. Immediately following the preamble were the questions (Q) of Moody and the answers (A) of Messina, typewritten as follows:
Q: MESSINA, I have received information that you have accepted money from Korean Contractors in return for doing them favors, is this true ?
A: I have received money for doing a favor for one contractor this has been the only dealings that I have had. I’ve had other contractors ask me to help them of which I’ve refused. Mr. MOON from Sam Wha Engineering and Construction Company, managering director, came into my office at KPA. He was concerned about why since he’s been registered with this agency he hadn’t as of yet received a proposal. I told him the procedure of how contractors are selected for RFP’s. After explaining this to him (Mr. MOON) he stated or asked if there was any other way that he could be placed on a contract. He also stated that he has been trying to receive a proposal and since he has been registered with us he never had an invitation. He said if I would do him a favor that he would in turn do me one. He asked if I could meet him some where after working hours. I asked him why and he stated to see if there was something I could do to help him. I told him that I would meet mm down town. That night I met him at the Yamha Cha Tea *1027 Room. I went down approximately 7:30 PM. His jeep was parked at the side of tbe building. I got into tbe jeep and be drove off somewhere in tbe vicinity of tbe Astor Hotel. We stopped at an eating place. Once inside tbe establishment be started to talk about many tilings other than tbe prune objective of tbe meeting. He asked me after we were there awhile if there was any way possible that I could put his name in front of other contractors. He also stated all be wanted was a chance to at least bid. I told him that I could pull his card and place him on a contract. Approximately four days later I took his card and placed him with five other contractors that I picked at random. I believe that I selected him on Spec number 264-66. The contract or the proposal actually was mailed to the companies on this day. He called me a couple of days after our first meeting and asked me to see him. I agreed to see him. I met him at 10:00 PM at the Yamha Cha Tea Room. At this time we went to a hotel the Kyung Gi I think it was and I think it’s near the Engineer District. At that time he asked me if I had sent him a proposal. I told him that one was in the mail and he should receive it in a few days. On Saturday of that week I met him in the area of the Central Post Office in Seoul, Korea. Around the corner of the Central Post Office he was standing on the curb with his companion who was a little small guy with glasses whom he (MOON) said was his engineer. Another man whom I found out afterwards was the Vice President of the company. Mr. MOON and the other little guy flagged over a Kimchi Cab who he instructed to follow his jeep. I rode in the cab and we followed the jeep. We went to some hotel that was on the same road that I met the people on. I got out of the cab we proceeded upstairs to a room through an interpretare (Mr. MOON’s friend the little guy) was talking back and forth with the VP. Asking if I could help him in the future. I told him that any other proposal he would receive would be strictly done by the rotation system that is used on the bidders list. At that time Mr. MOON pulled out the money and told me it was 80,000 won. And handed it to me for the service I had done for him. The Vice President stated that if I continued to help him that he would be willing to pay me more money. I told him that any future dealings I would have nothing to do with him. Since I’ve placed him on this proposal he has been continually calling on the telephone. I never talked with him *1028 about anything and I told him I was busy and couldn’t talk on the phone so he asked me if I could meet him on the outside and I told him No.
Q: When you accepted the money and did this favor for that company, did. you realize that you had violated a regulation?
A: Yes, I did.
Q,: I also have information that Miss KANG from the construction branch asked you to favor a company, is that true?
A: Yes, she asked me if I could put her brother or cousin on a contract for her. I told her I didn’t know. One day last week Mss KANG gave me a written list containing the names of thirteen contractors. She asked me to use the contractors on the Erosion Control Proposal. I brought the list upstairs and she had told me before that her cousin had been shot concerning business. I thought this over and I told her that I wasn’t going to put the thirteen names she gave me on the list. Now I understand that two of the contractors given to me by her were on the typed Form 42.1 didn’t select any of the contractors on this proposal. Now I understand that two from the list of thirteen were on this contract.
Q: Did Miss KANG offer you anything for this favor?
A: No, she did not.
Q: Do you have any of the 80,000 won left ?
A: Yes, approximately 10,000 won. I gave it to Mss KANG to hold for me.
Q: Why did you let Miss KANG keep the money for you?
A: Being so late in the month when I received it I should have been broke and I didn’t want anyone to see it plus the fact I had bought some clothes and I was going to use that money to pay for.
Q: Is there anything that you wish to add to this statement?
A: I know I did something wrong and I know that I’m going to have to be punished for it. And I’m willing to accept whatever action they feel should be taken. If there is any way that I could help the CID I’m willing to try. I just want to say that I’m sorry for what I did I’m not trying to sound like I’m giving you a hard luck story it’s nothing of the sort. I feel I’m old enough to know when I’ve done something wrong and I’m willing to face the fact that I did make a big mistake.
*1029 Q,: Is this statement true to the best of your knowledge and belief?
A: Yes.
Upon the completion of the typing of the questions propounded and answers given in the course of the taking of the statement, Moody requested Messina to read the statement and make and initial corrections and strikeovers (deletion of a word by x’s). Moody had deliberately made several strike-overs and also some errors in spelling, although some were also inadvertently made.
Messina read the statement completely, and initialed most of the strikeovers and at least two corrections of misspelled words, some on each of the three pages of the statement. As requested by Moody, Messina also initialed the commencement and end of the statement on each page thereof. Moody then called in another investigator, who served as a subscribing witness, and Moody administered orally to Messina, and Messina orally acknowledged and signed the oath printed at the conclusion of the form used.
Such oath stated that the subscriber had read and fully understood the contents of the statement, that the statement was true, that the subscriber had initialed all corrections and also the bottom of each page of the statement, and that the statement had been made freely without hope of benefit or reward, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement.
After the taking of the statement had been completed, Messina asked Moody what action would be taken against him, and Moody replied that he had no control over the disposition of the case. Messina expressed great concern as to whether or not his parents would be notified. Testimony to the contrary notwithstanding, it is concluded that the credible evidence is that Moody at no time threatened or attempted to contact Messina’s parents about the matter.
15. During the 2*4 hour period of time in the afternoon of February 2,1966, Moody advised Messina that he was going to interview Miss Kang about her part in the matter, and Moody asked and Messina agreed that he would come into *1030 the room in her presence and tell her what he had advised Moody with respect to her conduct, in the event she denied the acts.
Moody then sent Messina back to his duty post, and called in and proceeded to interview Miss Kang. Her office was immediately adjacent to that of the Bidders Branch, separated by a partition. She spoke English, but obviously with some difficulty, because Moody had his Korean interpreter-investigator verify her statements by conversation in the Korean language. She denied giving Messina the list of Korean contractors.
Moody then called Messina back into the office, and Mes-sina related to Miss Kang what he had told to Moody. She then admitted giving the list of names to Messina.
Miss Kang declined to give Moody a signed written statement, but her oral statement was thereafter recorded by Moody as an investigator’s statement on a Department of the Army Form 19-24, as follows:
On 2 February 1966, Miss Kang Ok Hi, 256 2-Ka Kwanghi-Dong, Chung-Ku, Seoul, Korea, employed as a clerk typist, Construction Branch, US Army Korea Procurement Agency was interviewed by this investigator. She was interviewed reference a statement obtained by the undersigned from PFC Balph J. MESSINA, US 51 536 847, in which he stated that Miss KANG had approached him while he was assigned to the Bidders Branch, US Army Korea Procurement Agency and asked him to assist her cousin, KANG Se Hi, in receiving invitations to bid on contracts at KP A for his two companies Sam Bo National Construction Co., Ltd., and the Kun Chang Enterprise Co., Ltd. Miss KANG verbally admitted that she had approached Pfc MESSINA and Pfc Gary W. TRUE, PA 27 596 780, also assigned to the Bidders Branch, US Army Korea Procurement Agency, and asked them to assist KANG Se Hi in receiving invitations to bid. She further admitted that during the week of 23-29 January 1966 she received a list of thirteen construction contractors from a cousin of hers and KANG Se Hi’s, KANG Sang Hi. This list she presented to MESSINA and asked turn to use these names to be selected to receive invitations to bid on an erosion control contract. Two of the list of *1031 thirteen names appeared on the list of bidders prepared by MESSINA and TRUE. Miss KANG was in possession of 8,000 Won belonging to MESSINA. This was the amount of money remaining from 80,000 Won that MESSINA had received from a Korean contractor and had given to Miss KANG for safekeeping. MESSINA originally gave Miss KANG 11,000 Won, however, she spent 3,000 Won on personal needs. Miss KANG refused to make a written statement. Her verbal statement was witnessed by PAK Sung Man, KN Investigator, 523d CID, APO US Forces 96301.
16. During the evening of February 2,1966, Moody went by automobile to Messina’s barracks. Outside of the barracks, Messina handed to Moody the Form 42 with an attached list of 13 Korean contractors. Some of the names listed on each document were common to both.
Messina was at his duty post in the Bidders Branch for about three days after February 2, 1966, but thereafter was confined to his barracks, except when escorted by someone of superior grade, until the charges subsequently brought were dropped.
Moody returned to Messina his Army identification card in the afternoon of February 2, 1966, but Messina was required to surrender the same at the time of his restriction to quarters, and such card was not returned to him until the charges against him were dropped.
17. On February 3,196,6, Warrant Officer Moody advised Colonel Alley, the commanding officer of military police of the Eighth Army, of the status of the investigation of Pfc. Messina, and Colonel Alley instructed Moody to investigate further and attempt to corroborate Messina’s admissions.
On February 8, 1966, Moody interviewed Moon Kwang Chun, a Korean, relative to the statement given by Pfc. Mes-sina to Moody on February 2, 1966. Moon did not speak English very well. Moody’s assigned Korean interpreter-investigator attended the interview and served as interpreter of the statements made by Moon in the Korean language. Moody requested but Moon declined to make a written statement. Moody then prepared his investigator’s statement of *1032 the interview, typing the same on a Department of the Army Form 19-24, as follows:
At 1015 hours, 8 February 1966, MOON Kwang Chun, General Manager of the Sam Wha Engineering and Construction Company, Ltd., was interviewed by the undersigned at my office at the US Army Korea. Procurement Agency, Seoul, Korea. MOON. was interviewed relative to a statement given to this investigator by PFC Messina who is assigned to the US Army Korea Procurement Agency in the Bidders Branch. MESSINA admitted in his statement that he had received 80,000 Won from MOON in return for issuing MOON’s company an invitation to bid. MOON admitted that he met MESSINA at the KPA office in December when he (MOON) came here to check his company’s records. He stated that on a subsequent visit he asked MESSINA to meet him at a tea room in Seoul and that they met at the Yamha Cha Tea Eoom in Seoul. From there they went to a Japanese restaurant located in Chong-Ro, Seoul. MOON was unable to remember the name of the restaurant. At this restaurant they had a meal and MOON told MESSINA that his company had been in business for about a year and that as yet had received no proposals from KPA. MOON asked for MESSINA’s help in getting a proposal. MESSINA, according to MOON, made no definite commitment to give him any assistance. However, a few days later MOON did receive a proposal on Specification #264-66 for the Maintenance and Repair of Drainage System at Yongsan. When Moon received this proposal he contacted MES-SINA by telephone and suggested that they meet somewhere in Seoul. MESSINA and MOON met at a hotel in the Chong-Ro area of Seoul, Korea. MOON was unable to recall the name of the hotel. At this time MOON offered to buy some drinks for MESSINA but MES-SINA refused. According to MOON, he gave MESSINA the money he intended to buy drinks with, 80,000 Won. MESSINA accepted the money and departed the hotel. According to MESSINA’s statement MOON was accompanied on this occasion by two other men who were introduced as the Company Vice President and a Company engineer. MOON states, however, that there was only his driver with him and a personal friend, CHO Chang Sun and that CHO is in no way connected with his company. MOON further alleges that this action of *1033 paying MESSINA for the proposal was done without his company’s knowledge or sanction and that he alone must be held responsible. He also said that the money he used to pay MESSINA was personal funds and not company funds. MOON was asked to reduce his statement to writing, however, he refused to do so. PAK Sung Mon, KN Investigator, 523d CID, APO US Forces 96301, was present during the entire interview and performed the function of interpreter.
18. On February 18, 1966, Colonel Robert J. Keefer, as commanding officer of the Korea Procurement Agency, signed formal charges against Pfc. Messina, in which the specification of charges was as follows:
Specification: In that Private First Class E-3 Ralph J. Messina Jr, US Army, United States Army Korea Procurement Agency, did, at Seoul, Korea, during the month of January 1966, violate a lawful general regulation, to wit: Paragraph 8a, Army Regulation 600-50, dated 3 April 1964, as changed by Change 1, dated 4 January 1965, by wrongfully accepting a gratuity of approximately 80,000 won from Moon, Kwang Chun, a person endeavoring to engage in procurement activities with the United States Army Korea Procurement Agency, an agency of the Department of Defense.
At the time 80,000 won were worth $296.30. Colonel Keefer formally informed Pfc. Messina of the charges that same day.
On the formal charge sheets, under the heading of Documents and Objects, were listed the written statement of Pfc. Messina made by him to Moody, and Moody’s summaries of the verbal statements of Miss Kang and Moon. Such documents were not attached to the formal charges, nor was any explanation contained within the formal charges as to where such documents could be found.
On February 18,1966, Colonel Keefer by use of an appropriate Army form forwarded the formal charges against Messina to Colonel Ralph J. Whitt, Commanding Officer, Special Troops, Eighth Army, whose command covered the Korea Procurement Agency. Attached to the transmittal form were the above-mentioned written statement of Pfc. *1034 Messina and Moody’s summaries of the oral statements of Moon and Miss Kang.
The formal charges and other documents were received by Colonel Whitt on February 21,1966.
By order of Colonel Whitt, the charges against Messina were referred on March 7, 1966, to a special court-martial which had previously been appointed by Colonel Whitt. Colonel Whitt had special court-martial jurisdiction only, having no authority to convene a general court-martial.
Lt. Thomas McElwain was appointed trial counsel, or prosecutor of the charges against Messina, and Lt. Robert K. Frazier was appointed as defense counsel for Messina. Neither of them was a lawyer, but both had had considerable experience serving as counsel in a special court-martial.
19. Lt. Frazier did not confer with Pfc. Messina at any time. However, he and a Lt. Haeder did call on Warrant Officer Moody and engage in a discussion concerning the taking of Messina’s statement by Moody. They asked whether Moody had instructed Messina as to his rights under Article 31 of the Uniform Code of Military Justice. Moody repeated for them the admonition which he had given to Messina, as related in finding 13.
Lt. Haeder was a young lawyer, who had been admitted to the practice of law in the State of Oregon, just prior to the start of his military service. He had had no experience in the practice of law, except that he was assigned as counsel to contracting officers in the Korea Procurement Agency. He was a close friend of Pfc. Messina. He was not assigned to defend Messina, but did voluntarily confer with and advise Messina. On one occasion at his office, he declined to talk with Messina, asserting that he had been instructed not to participate in the matter.
Colonel Robert J. Keefer, Commanding Officer of the Korea Procurement Agency, learned that Lt. Haeder was devoting a considerable portion of his duty time acting as a legal advisor to Messina, and told Haeder that unless he was assigned as defense counsel, he was to perform his assigned duties at the Procurement Agency, and that he had no proper business in the Messina case solely on the happen *1035 stance that he was a lawyer. No request was ever made that Lt. Haeder be assigned as defense counsel for Messina. Despite Colonel Keefer’s instructions, Lt. Haeder did continue to participate in the Messina case.
20. On February 21, 1966, Lt. Haeder and Pfc. Messina went to the telegraph office in Seoul, Korea, and Lt. Haeder prepared and caused to be transmitted to plaintiff Kalph J. Messina, Sr., in Lunenburg, Massachusetts, the following telegram:
KALPH ACCUSED ACCEPTING BRIBE FOR FAVORS TO CONTRACTOR (KR) KR PHYSICALLY THREATENED RALPH IF NOT PLAY-BALL KR HIMSELF SHOT IN PAST CAPERS ON KPA CONTRACTS KR’S SISTER WORKS FOR KPA TRIED PERSUADE RALPH HELP KRS GET BIDS RALPH SUSPECTS FRAM BY LOCAL CID SISTER KR CID GRILLED RALPH FOUR TIMES ON FOURTH RALPH SIGNED STATEMENT ADMITTING ACCUSATION RALPH VERY AGITATED FRIGHTENED REQUESTS SISTER ANN SEND JOHN FITZGERALD DAD SEND GEORILEY I’M ARMY COUNSEL WORK KPA BELIEVE RALPH ANSWER SOONEST TO RALPH
Thereafter, on March J, 1966, Pfc. Messina wrote and mailed a letter to his sister Ann in Massachusetts, advising that his lawyer-friend, Lt. Haeder, had been told not to help him in any way, and that he had been left out in the cold with some flunky given him as a lawyer.
21. Upon receipt of the telegram mentioned in finding 20, plaintiff Ralph J. Messina, Sr., undertook to retain plaintiff John H. FitzGerald to go to Seoul, Korea, to defend Pfc. Messina.
To secure information concerning the nature and status of the charges, FitzGerald obtained the assistance of Congressman Phillip J. Philbin of Massachusetts. By telephone calls on March 9 and 10,1966, the Legislative Liaison Branch, Department of the Army, obtained from Headquarters, Special Forces, Eighth Army, Seoul, Korea, the information that the expected trial date of the charges against Pfc. *1036 Messina was March 21,1966, that Messina was charged with violation of an Army regulation by accepting a gratuity of 80,000 won from a Korean who was engaged in procurement activity with the Department of Defense, and that the type of court-martial was special. This information was provided to Congressman Philbin and in turn by him to Mr. FitzGerald.
The maximum amount of money which plaintiff Ralph J. Messina, Sr., was able to raise to pay fees and expenses of Mr. FitzGerald to undertake the case was the sum of $6,000. His home was then mortgaged, with the unpaid balance being $2,000. To obtain the $6,000, the mortgage indebtedness was refinanced in the sum of $8,000, and the expenses incident to the refinancing were from $100 to $125. After considerable importuning by Mr. Messina, Sr., Mr. FitzGerald agreed to take the case, and on March 15, 1966, the sum of $6,000 was deposited by Mr. Messina, Sr., in the bank account of Mr. FitzGerald. Mr. FitzGerald had indicated that $20,000 would be a reasonable fee.
The refinancing of the mortgage indebtedness on the Mes-sina home increased the interest rate from 4 percent on the prior indebtedness to 4y2 or 5 percent on the $8,000. Monthly payments increased from $70 to $100.
22. In the meantime, Mr. FitzGerald obtained a passport, and made a trip to New York City for the purpose of obtaining and where he did obtain a visa from the South Korean Embassy, expedited by the intervention of agents whom he found and retained.
23. After making travel arrangements through a travel agency, Mr. FitzGerald departed by airplane from Boston for Seoul, Korea, on March 16, 1966. After stops at San Francisco, Honolulu, and Tokyo, he arrived at Seoul Airport on March 19, 1966, and then obtained a room at the Chosun Hotel. He then contacted Pfc. Messina. About an hour later, Messina arrived at the hotel, escorted by a Sergeant Davis, who advised FitzGerald that orders existed that Messina was confined to the base unless accompanied by a superior, after first securing permission. As requested by FitzGerald, Sergeant Davis waited in the hotel lobby, while *1037 FitzGerald conferred with Messina in the hotel room. The conference lasted for several hours. When FitzGerald concluded Ms interrogation of Messina, it was evening, and Messina then departed with Sergeant Davis to return to the base.
24. The next day, Sunday, March 20,1966, FitzGerald went to the 'barracks to wMch Pfc. Messina was assigned, and there met and conferred with Messina, Lt. Haeder, Pfc. Gary W. True, who was the other clerk in the Bidders Branch, and with several other colleagues of Messina.
On Monday, March 21, 1966, the date set for the trial of charges against Messina before the special court-martial, FitzGerald was ready to commence the trial with preliminary motions to quash and to suppress evidence, obviously planning to attack the validity and admissibility in evidence of the statement made by Messina to Moody. In the meantime, Major Leonard L. Preston, Adjutant to Colonel Ralph J. Whitt, who had referred the charges against Messina to the special court-martial, had postponed the trial until March 23, 1966. This was done with the approval of Colonel WMtt.
The appointed trial counsel, or prosecutor, Lt. McElwain, had advised Major Preston that Moon, the alleged briber of Messina, and Miss Kang, who had allegedly supplied the list of 13 Korean contractors to Messina, had both stated that they would not appear as witnesses, and that since there was no way to compel them to testify, there would be no proof of the corpus delicti, or proof of the commission of a crime, which was essential to the admission in evidence of the confession by Messina.
On March 21, 1966, FitzGerald met with Lt. McElwain and the assistant trial counsel, Lt. Griffin, and FitzGerald was advised by them that they had previously recommended to Major Preston that the charges against Messina be dropped because of inability to prove the corpus delicti.
FitzGerald then requested Lt. McElwain and Lt. Griffin to accompany him for a meeting with Major Preston. At the latter’s office, FitzGerald in his own words “blew his top” concerning Major Preston’s refusal to dismiss the charges against Messina.
*1038 25. Prior to March 21,1966, Colonel Whitt had been advised by Major Preston that there was some doubt that Moon and Miss Kang would appear as witnesses at the trial, but that the refusal was not conclusive. He approved the postponement of the trial to March 23, 1966, with the understanding that a final effort would be made to have those witnesses appear and testify.
On March 21,1966, Colonel Whitt received Mr. FitzGerald at his office, and FitzGerald asserted that Moody had used unlawful tactics in obtaining the statement from Messina, and that Major Preston was an incompetent. FitzGerald asserted that if Colonel Whitt insisted on bringing the case to trial, he would use certain legal precedents and tactics to confuse the court, would make the court look silly, and if necessary, would take the case all the way to the Supreme Court.
Colonel Whitt then took the matter up with the Office of the Staff Judge Advocate of the Eighth Army, explaining the nature of his interview with FitzGerald, and suggesting that a qualified Army lawyer should be assigned as trial counsel to engage in the trial to meet the tactics and experience of FitzGerald. The JAG office agreed with Colonel Whitt, and undertook to find an Army lawyer available for assignment to the case.
26. On March 22, 1966, FitzGerald, in the company of Lt. Haeder, interviewed separately Miss Kang and Moon.
In his affidavit in evidence in this case, being the same one submitted to the Committee of the Judiciary of the House of Kepresentatives, FitzGerald asserted that by using the methods which he ascribed to Warrant Officer Moody, he was able to get the desired affirmative or negative answer to any question asked of Miss Kang. In the affidavit, FitzGerald asserted that Miss Kang denied that she had any knowledge of Messina’s involvement with any Korean contractor or any knowledge of 80,000 won, and that she responded that Moody had threatened to prevent her plans to enter the United States to work in the United Nations. In the affidavit, FitzGerald asserted that Moon denied emphatically that he had ever given a bribe to Private Messina, and ascribed to Moon *1039 statements to the effect that Moody promised Moon assistance in acquiring contracts if he would help Moody “get” Private Messina.
27. On March 23,1966, Colonel Whitt received advice from the Eighth Army JAG office that arrangements had been made for Captain Harvey L. Anderson, a qualified Army lawyer, to serve as trial counsel, or prosecutor, in the trial of the charges against Messina in the special court-martial. FitzGerald had previously requested that an Army lawyer be assigned to assist him, and in that connection the JAG office supplied Colonel Whitt with the name of Captain Anthony P. Cillufo.
On the same day, by order of Colonel Whitt, Major Preston executed an order appointing Captain Anderson as trial counsel, Captain Cillufo as defense counsel, Lt. McElwain (previously trial counsel) as assistant trial counsel, and Lt. Frazier (previously defense counsel) as assistant defense counsel. Captain Cillufo, an experienced lawyer, thereafter cooperated diligently with FitzGerald.
At the time of his appointment and prompt notification, Captain Anderson was assigned to the 7th Administrative Company, 7th Infantry Division, at Camp Casey, Korea, located about 25 miles north of Seoul.
La order to allow Captain Anderson time to accomplish travel from Camp Casey, and thereafter prepare for the trial, by order of Colonel Whitt, the trial of the charges against Messina before the special court-martial was postponed first to March 26,1966, and then to March 29,1966.
28. On March 23, 1966, FitzGerald “summoned” (to use his word) the two original prosecutors, or trial counsel, Lt. McElwain and Lt. Griffin, Lt. Haeder, and Major Preston into the office of Colonel Whitt, where (again using his own words) FitzGerald
* * * stood up and reviewed every detail of this matter, hurling barbed accusations at army officers (some being present) who were distorting the truth, manufacturing evidence, coercing Korean nationals under penalty of forfeiture, and brainwashing enlisted personnel in order to convict Pvt. Messina on an obviously trumped-up charge. * * *
*1040 FitzGerald stated that this speech was an “hour and one half indictment of the military,” and that not one small voice was raised in opposition to any accusatory statement made by him. His conclusion was that such silence was a classic consent to the truth of the matters asserted by him.
It is found that no such inference can reasonably be drawn from the circumstances attendant to this conference. Such meeting could not be considered to be a conference arranged for a rational discussion of Messina’s case.
By letter to Colonel Whitt, dated March 23, 1966, Fitz-Gerald expressed violent opposition to delays in the trial, demanded dismissal of the case, asserted that Moody had illegally interrogated Messina, stated that the actions of Moody were like a Russian-spawned novel, accused Major Preston of seeking assignment of an Army lawyer to insure conviction of Messina, claimed that Major Preston was delaying the trial for greed and for his own self aggrandizement, extolled his own patience as endowed by birth and derived from the nature of his profession, and advised that he would submit a bill to the Army to reimburse all of his expenses in addition to his loss of business in Boston.
29. Thereafter Captain Anderson, as new trial counsel, appeared at the pertinent base and undertook his investigation of the charges against Messina. On two or three occasions, he met with FitzGerald, with the last of such meetings held on Sunday, March 28,1966.
In the meantime, Captain Anderson held a series of interviews, first with Lt. McElwain and Warrant Officer Moody, then with Major Preston, then a short meeting with Colonel Whitt, and after time spent in studying the case file and planning his investigation, meetings in succession with Miss Kang and Moon. Moon stated to Captain Anderson that he would not testify. Thereafter Captain Anderson made his recommendations:
Dated March 28, 1966, and addressed to the Commanding Officer, Special Troops, Eighth U.S. Army, through the Staff Judge Advocate, Eighth U.S. Army Support Command, *1041 Captain Anderson’s written statements and recommendations were as follows:
1. In the case of Pfc Messina I have had a chance to interview the key witnesses.
2. My analysis of the case is as follows:
a. The statement or confession made by Pfc Messina would be admissible in court.
b. Mr. Moon has denied that he paid any money, and has indicated that he would so testify, if he would appear at all. He is not amenable to process.
c. Miss Kang was not a party to the original transaction. She received some money from the accused to hold for him. She has indicated that she may not have known where Pfc Messina obtained the money.
d. CID investigator Moody talked to one other Korean witness who allegedly was present at the time the bribe was paid. He denied witnessing any bribe or meeting with the accused.
e. Lt Hamby of the Korea Procurement Agency briefed me on the procedure followed in selecting contractors to receive invitations to bid. Usually 6 or 7 would be selected from Group A of their qualified bidders list. The exact selection was to be made at random by Pfc Messina or another, a Pfc True, at the time the offense took place. After receiving such an invitation the contractor would be placed in Group B. Only after all of the contractors in Group A had received an invitation to bid on any given project would those in Group B receive any. When Group A was exhausted, Group B would become Group A and the whole process repeated. I was further informed that any contractor on the qualified list would receive an invitation to bid within a one to' three month period under existing work schedules.
f. Mr. Moon was a qualified bidder, and apparently was in Group A. He came in in December to complain about not receiving any invitations to bid. He also came in in January, and there arranged the first meeting with Messina. Messina met with Mr. Moon. Shortly thereafter (perhaps a week or 10 days) Mr. Moon received such an invitation to bid. He then again contacted Pfc Messina, arranged a meeting and sometime at the meeting gave him the money. According to Pfc Messina the payment of money had not been prearranged but rather was done on the spur of the moment. Mr. Moon’s original statement did not indicate anything to the contrary.
*1042 3. Analysis of the law:
a. In order to convict a man of a crime it must be proved, independently of a confession of the accused, that a crime was probably committed. Mere corroboration short of proof of a crime is insufficient. Mr. Moon is an essential witness and without Mm no proof of the crime can be established. Considering the procedure followed by KPA the receipt of an invitation to bid by Mr. Moon in January is not unusual, as he was bound to receive one either in December, January or February. The testimony of Miss Kang would be corroborative of the confession, but does not establish the commission of an offense.
4. Kecommendation: That the charge and specification against Pfc Ealph J. Messina? Jr., be dismissed, and that consideration be given to withholding an amount equal to the 80,000 won he received from his pay on the ground that he received the money for discharging Ms duty to the United States Government.
30. By a written statement issued March 29,1966, Colonel Whitt announced that the charges against Messina were withdrawn. FitzGerald was advised of such action in turn by Captain Cillufo and Captain Anderson in the early evening of March 29,1966.
FitzGerald departed from Seoul, Korea, on March 30, 1966, and reached Boston some five days later, including a stop over at Honolulu for three days. Prior to Ms departure from Seoul, FitzGerald advised plaintiffs, Mr. and Mrs. Ealph J. Messina, Sr., by telephone that the charges had been withdrawn against their son, Pfc. Messina.
31. By written statement, dated March 31, 1966, to the Commanding General, Eighth United States Army, Colonel Whitt advised that on the written recommendation of trial counsel, the charges against Messina had been withdrawn on March 29, 1966, called attention to Messina’s admissions concerning acceptance of 80,000 won from Moon, advised that 8,000 won had been confiscated and was being held by the Criminal Investigation Division, and requested guidance as to the disposition of the 8,000 won, and as to whether there was authority for withholdmg 12,000 won from Mes- *1043 sina’s pay, and if so, the procedures that should be followed.
Under date of May 23,1966, written advice was submitted to Colonel Whitt by the appropriate JAG office, through the Commanding General, Eighth Army, that the confiscated 8,000 won should be turned over to the servicing finance officer for deposit in a certain Army account, and that the Commanding Officer had the authority to make an administrative determination that a sum equal to 72,000 won (approximately $266.67) be deducted from Messina’s pay.
Thereafter the recommended disposition of the 8,000 won and the deduction of the equivalent of 72,000 won from Messina’s pay were accomplished.
32. At the time of the presentation of his testimony in the trial of this case on November 17, 1969, plaintiff Ralph J. Messina, Sr., had been employed for 24 years in a plastic mill by Foster Grant Company.
In 1964, he was suffering from arteriosclerosis, and underwent a serious operation in which eight or nine inches of arteries were removed from each of his legs, and replaced with artificial arteries. He was out of work for six or seven months during convalescence.
In 1966, he was 64 years of age, and was planning to retire upon reaching 65, 'but was unable to do so because of his obligations incident to the refinancing of the mortgage indebtedness to pay $6,000 to FitzGerald.
Mrs. Ralph J. Messina, Sr., had suffered severe emotional distress during the illness, operation and convalescence of her husband, requiring medication and medical care, and her knowledge of the plight of her son, Pfc. Messina, worsened her condition, causing an acute anxiety state which lasted for a substantial period of time. On May 18,1966, her doctor prepared a written statement, thereafter submitted to the United States Army, that Mrs. Messina’s condition of acute anxiety would not improve until her son was returned to the United States. There is no evidence as to the extent, if any, to which costs of medical care for Mrs. Messina were increased as a result of her concern over the plight of her son, Pfc. Messina.
*1044 33. Prior to 1960, FitzGerald had had an extensive practice in the law, engaging in many trials, civil and criminal, both jury and non-jury. However, commencing in 1960, his practice of law tapered off, as he began to engage in business activities. In 1966, and for a year or two prior thereto, he was spending 80 percent of his time in the operation of a restaurant, of which he was part owner, located in Chelsea, Massachusetts.
Except for very general statements made by FitzGerald, not acceptable as credible or substantial evidence, there is no proof that he sustained any loss of business or clientele as a result of his trip to Seoul, Korea, to defend Pfc. Messina.
In connection with his services in the case of Pfc. Messina, FitzGerald incurred and paid expenses as follows: $1,078 for transportation by airplane from Boston to Korea and return; $100 for taxicab fares (including transportation to and from airports) for the entire period between his departure from and return to Boston; $182 for his hotel accommodations at Seoul from March 16 through 29, 1966; $33 for meals in Korea, nearly all of which were taken at the facilities on the Army base at $3 per day; $35 for hotel expenses in his stopover at Honolulu enroute to Korea; $7 for an inoculation by a private physician at Honolulu; $30 for a piece of luggage purchased at Honolulu; and $35 for hotel expenses in his stopover at Tokyo. Obviously, Fitz-Gerald incurred expenses on his trip to New York City to obtain the visa from the South Korean Embassy, and also in connection with his 3-day stopover at Honolulu on his return from Korea, but there is no evidence as to the expenses incurred and paid in these two respects. Allowing $100 for the trip to New York City, and $35 for 1 day of the 3-day stopover at Honolulu (2 days being regarded as for his own convenience), the total of expenses incurred and paid by FitzGerald would have been $1,585, and the net fee received by FitzGerald for his services in the Messina case thus amounted to $4,415.
The time spent by FitzGerald on the Messina case, allowing 1 full day for his trip to New York City and 18 days *1045 for the trip to Korea (after excluding 2 days of the stopover in Honolulu on the return journey), amounted to 19 calendar days, and his net fee of $4,415 thus amounted to a daily rate of $232 per day, which rate was adequate in view of the limited capacity of his clients to pay attorney’s fees, and especially because of the failure of proof that FitzGerald sustained any loss of business or clientele on account of his services in the Messina case.